F I L E D
Clerk
District Court

DEC 09 2015

for the Northern Mariana Islands
By_____
(Deputy Clerk)

# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN MARIANA ISLANDS

| | |
|---|---|
| YU XUAN, | ) 1:12-CV-00032 |
| | ) |
| Plaintiff, | ) |
| | ) |
| | ) **DECISION AND ORDER GRANTING IN** |
| v. | ) **PART AND DENYING IN PART THE** |
| | ) **PARTIES' MOTIONS FOR SUMMARY** |
| JOO YEON CORPORATION and SE | ) **JUDGMENT** |
| YOUNG CORPORATION, YANG TACK | ) |
| HWANG and YOUNG-SIN PARK, | ) |
| | ) |
| Defendants. | ) |
| | ) |

## I.    INTRODUCTION

Plaintiff Yu Xuan sued her former employers for wage and overtime violations of the Fair Labor Standards Act ("FLSA") and the Commonwealth of the Northern Mariana Islands ("CNMI" or "Commonwealth") Minimum Wage and Hour Act ("MWHA"), and for breach of an employment contract essentially promising to comply with those laws. (Compl. ¶¶ 52-74.) Having completed discovery, she now seeks summary judgment on all her claims against the Defendants to hold them jointly and severally liable to her for $124,424.23, plus costs and attorney's fees. (Xuan Mot. 2, ECF No. 131.) In particular, Xuan seeks findings that: (1) she performed work for which she was not paid in violation of the FLSA and an employment contract; (2) she is entitled to liquidated damages because Defendants did not act in good faith; and (3) Defendants are all "employers" for purposes of the FLSA. (Xuan Mem. 4, 7, 13, ECF No. 132.) Defendants Joo Yeon Corporation ("JYC"), Se Young Corporation ("SYC"), Yang Tack Hwang, and Young-Sin

Park seek summary judgment on the underlying dispositive issue—whether Xuan demonstrated that she worked hours for which she did not receive compensation—as well as two more limited questions: (1) whether Defendants' failure to comply with the FLSA was "willful," thereby expanding the statute of limitations from two years to three, and (2) whether Park was an "employer" within the meaning of the FLSA. (Def. Mot. 1-2, ECF No. 134.)

Because genuine issues of material fact dominate the key issue of this case, and because the resolution of this case will depend in large part on Plaintiff Xuan's credibility, the Court will deny Xuan's motion for summary judgment on the key question of hours worked. Nevertheless, because Xuan's assertions of hours worked, if believed, would entitle her to relief, the Court will also deny Defendants' motion for summary judgment on that issue. With respect to the remaining issues, the Court finds that: (1) Defendants willfully violated the FLSA; (2) Defendants did not act in good faith; (3) JYC, SYC, and Hwang were joint employers for purposes of FLSA liability; and (4) Park was not an employer under the FLSA. The Court will enter judgment accordingly.

## II.    FACTS

Xuan worked as a tour guide for JYC from June 2008 until October 2012. (JYC Interrog. Resp. 4, ECF No. 133-5.) She principally ferried tourists between the airport, hotels, and Saipan tour areas (*Id.*), but also worked at Seaman's Restaurant, which was operated by SYC, approximately five days each week around dinner time. (Xuan Depo. 87:24-93:2, ECF No. 143-1.) For her work, Xuan was paid a flat rate of $800 each month (increasing to $1,000 per month beginning in mid-July 2012). (Xuan Decl. ¶¶ 4-5, ECF No. 136.) JYC paid Xuan's taxes, and also gave her access to lodging, meals, and a car for her personal use. (JYC Depo. 108:19-109:4, 134:23-135:6, ECF No. 133-1.)[1]

---

[1] The Court notes that Hwang regularly refers to Xuan as "Rosa" in the deposition transcripts. As the parties clarified in Hwang's individual deposition, Rosa is Xuan's English name. (Hwang Depo. 97:23-98:4, ECF No. 133-3.)

2

JYC is owned and managed by Hwang. (JYC Depo. 53:7-9.) He makes all the business decisions, including hiring and firing employees. (JYC Depo. 21:5-13.) He also originally formed SYC as a tourism business. (Hwang Depo. 9:4-17, ECF No. 133-3.) Later, Hwang gave SYC to his sister to operate a restaurant. (Hwang Depo. 82:5-22.) Park, Hwang's wife (JYC Depo. 101:10-11), sometimes helped her sister-in-law at the restaurant by translating for English-speaking staff and customers (Park Depo. 15:24-17:5, ECF 133-4.). JYC pays the restaurant's rent (JYC Depo. 35:22-36:4), and also provides it with its only customers—JYC tourists (SYC Depo. 36:23-37:20, ECF 133-2).

JYC did not keep any records of the number of hours Xuan worked. (JYC Interrog. Resp. 6-7.) Instead, JYC paid her on a strictly monthly basis. (JYC Depo. 46:12-22.) Prior to Xuan's complaint, another of JYC's employees had complained to the CNMI Department of Labor about improperly paid salary (Hwang Depo. 17:4-23), but JYC did not begin keeping time records until Xuan filed her complaint (JYC Depo. 46:10-25).

Xuan alleges that she worked, on average, at least 12.5 hours each day. (Xuan Decl. ¶ 13.) She does not have any documentation of her hours worked, but estimates that she worked 18 hours on her busiest days, at least 10 on her easiest, and never less than 8 hours per day, even on the slowest days. (Xuan Decl. ¶¶ 9-12.)

## III.    DISCUSSION

There are essentially three issues at play in the parties' competing motions for summary judgment: (1) the number of hours Xuan worked; (2) whether Defendants willfully violated the FLSA, or whether Defendants simply erred in good faith; and (3) whether JYC, SYC, Hwang, and Park were all Xuan's employers under the FLSA. The Court will address the issues in turn.

*a.   Summary Judgment Standard*

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The substantive law makes clear which facts are "material," and a dispute is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). On a motion for summary judgment, the "evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." *Id.* at 255. However, summary judgment is appropriate "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 323 (1986).

Although courts do not weigh the evidence in summary judgment motions, when the credibility of the movant's affiants or witnesses is questionable, a court may find a genuine issue of material fact and deny summary judgment. *See Hoover v. Switlik Parachute Co.*, 663 F.2d 964, 968 (9th Cir. 1981) (noting that deposition discrepancies point to credibility, which is "particularly appropriate for jury determination"); Wright, Miller & Kane, Federal Practice & Procedure: Civil 3d § 2726 ("if the credibility of the movant's witnesses is challenged by the opposing party and specific bases for possible impeachment are shown, summary judgment should be denied and the case allowed to proceed to trial").

*b.   Hours Worked*

This case hinges on whether Xuan worked hours for which she was not paid. Defendants argue that they are entitled to summary judgment because Xuan failed to provide sufficient evidence that she actually worked 12.5 hours each day—or on any day at all. (Def. Mot. 9-16.)

4

Xuan, on the other hand, argues that she has presented sufficient evidence of her overtime hours to shift the burden to the Defendants. (Xuan Mem. 4-7.) Because Xuan's testimony, if believed, would suffice to establish her hours worked, the Defendants' motion cannot be granted. However, because Xuan's inconsistent statements about her hours worked raise questions about her credibility, her motion too must be denied.

Additionally, to the extent that the parties seek summary judgment on Xuan's entitlement to contract wages, similar issues of proof will control. Accordingly, the Court finds that summary judgment is inappropriate as to the contract claims.

Employees engaged in commerce who work in excess of 40 hours in a workweek must be paid at a rate of at least 1.5 times their normal pay for the overtime hours. 29 U.S.C. § 207(a). Employers who fail to pay employees for their overtime work are liable to their employees for the full amount of the unpaid overtime, as well as "an additional equal amount as liquidated damages." 29 U.S.C. § 216(b). The FLSA also requires an employer to keep records of his employees' wages and hours to prove compliance with the wage and hour provisions. 29 U.S.C. § 211(c).

An employee suing her employer for unpaid wages and overtime under the FLSA bears the burden of proving that she "performed work for which she was not properly compensated." *Anderson v. Mt. Clemens Pottery Co.*, 328 U.S. 680, 687 (1946). However, when her employer fails to record hours as required by the FLSA, an employee satisfies her burden of production if she "produces sufficient evidence to show the amount and extent of that work as a matter of just and reasonable inference." *Id.* Upon that showing, the "burden then shifts to the employer to come forward with evidence of the precise amount of work performed or with evidence to negative the reasonableness of the inference to be drawn from the employee's evidence." *Id.* at 687-88. ("If

5

the employer fails to produce such evidence, the court may then award damages to the employee, even though the result be only approximate.").

Defendants do not dispute that there is no documentation of Xuan's wages and hours, as required by the FLSA. (*See* Def. Opp'n 3, ECF No. 139.) Instead, they argue that Xuan has failed to provide evidence sufficient to show the amount of hours she worked within a "just and reasonable inference." (Def. Mot. 9-10, ECF No. 134.) The Court disagrees.

Here, Xuan presents evidence of her hours worked in the form of deposition transcripts and a declaration. In her declaration, Xuan describes a "typical day" on the job:

> A typical day for me might start with going to the office before 8:30 a.m. From there I would make a round to the all of the hotels to pick up guests for a trip to Managaha. After picking up all of the guests I would bring them back to the office to get their snorkeling equipment. From the office I would drop off the guests at the dock for their 10 a.m. boat trip to Managaha. Depending on whether I needed to take other guests to optional activities after that I would be on standby until it was time to pick up departing guests at their hotels before 12:30 p.m. I would then drive these guests to the airport by 1:00 p.m. so they can check in for their 2:30 p.m. flight. I would then stay at the airport to pick up arriving guests and take them to their hotels. I would check the guests in to their hotels and drive back to the office. By that time it is around 4 or 4:30 p.m. and then it is time to pick up the guests returning from Managaha. So, I would drive to the dock and pick up the guests, then drop them off to their various hotels. Then I would wait a little bit for the guests to shower or clean up and change. Then it was time to pick up the guests again around 6:00 p.m. to take them to a dinner show. I would have to wait for the guests while they are at the dinner show. Depending on which show they are at, I would pick up the guests after the show from 8:00 p.m. to around 10:00 p.m. After the shows I drop the guests back to their various hotels. By the time that is finished it could be 10:30 or 11:00 p.m. After that I have a couple of hours to rest before I need to pick up guests who are done with their trip to take them to the airport. I would pick up the guests before 1:00 a.m. and take them to the airport to check in for their departing flight. Then I would wait at the airport for guests who are arriving. The flight usually arrived at about 1:40 a.m. I would pick up those arriving guests, take them to their hotel, and check them in. It could be around 3:30 a.m. before I am finished. After that, I can rest for a little bit before starting again before 8:30 a.m. This would be a very typical day and repeated seven days per week.

(Xuan Decl. ¶ 7, ECF No. 136.) Xuan estimates that she worked an average of 18 hours each day during the busiest tourist seasons, July through August and December through February, but that

1  her schedule was closer to 10 hours each day during the rest of the year. (Xuan Decl. ¶¶ 9-11.)

2  On average, she estimates that she worked 12.5 hours each day. (Xuan Decl. ¶ 13.)

3        Xuan's declaration is consistent with her deposition testimony. For instance, she estimated

4  that she worked between 10 and 18 hours, but more than 12 on average:

        Q: Okay. As you sit here today, do you know how many hours you worked every
        day?
        A: Well, when there were—when I worked—worked—had to work a lot of times,
        it could be 18 hours. And when I worked less that was 10 hours.
        Q: Okay. So you are saying that you worked from 10-18 hours per day?
        A: Well, you have to see that I had—I worked at least more than 12 hours averagely.
        Q: On average. On average you worked more than 12 hours per day; is that correct?
        A: Yes.

10  (Xuan Dep. 124:14-25, ECF No. 143-1.) Given the circumstances, it would not be unjust or

11  unreasonable to infer that Xuan actually worked 12.5 hours on average, particularly given her

12  "typical day" declaration. *See Mt. Clemens Pottery*, 328 U.S. at 687.

13        Defendants point out that Xuan did not record her hours, and could not recall the exact

14  number of hours she worked on any particular day or month.

        Q: Do you remember the hours that you worked each day?
        A: Well, it—it's not the same every day and—but I just assumed that I worked
        more than 12 hours every day.
        …
        Q: Okay. Let me restate the question. How many hours did you work each day, on
        average, in January of 2012?
        A: That I cannot calculate right now.
        Q: And the reason you can't calculate it is because each day varied, correct?
        A: Yes.

21  (Xuan Dep. 133:21-25, 134:11-17.) However, as the Supreme Court noted in *Mt. Clemens*

22  *Pottery*, an "employer cannot be heard to complain that the damages lack the exactness and

23  precision of measurement that would be possible had he kept records in accordance with the

24  requirements of [the FLSA]." 328 U.S. at 688; *see Brock v. Seto*, 790 F.2d 1446, 1448 (9th Cir.

25  1986) ("*Mt. Clemens Pottery* leaves no doubt that an award of back wages will not be barred for

7

imprecision where it arises from the employer's failure to keep records as required by the FLSA.").

Defendants also point to several cases in which a court ruled against an FLSA plaintiff based on the vagueness of the plaintiff's assertion of hours worked. *See Harvill v. Westward Commc'ns*, 433 F.3d 428, 441 (5th Cir. 2005); *Daniels v. Finish Line, Inc.*, No. 2:07-cv-1501, 2008 WL 4814008, at *3, 2008 U.S. Dist. LEXIS 122094 (E.D. Cal. Oct. 31, 2008); *Millington v. Morrow Cty. Bd. Comm'rs*, No. 2:06-cv-347, 2007 WL 2908817, at *7, 2007 U.S. Dist. LEXIS 74348 (S.D. Ohio Oct. 4, 2007); *Anderson v. Indep. Sch. Dist. No. 281*, 2002 WL 31242212, at *8, 2002 U.S. Dist. LEXIS 19177 (D. Minn. Oct. 4, 2002). However, unlike the present case, the employers in those cases actually maintained wage and hour records in accordance with the strictures of the FLSA. *See Daniels*, 2008 WL 4814008, at *2 (observing that employer's corporate policy was to reduce employee timecards only when they left work without punching out, but that managers were told that "it is never acceptable to work an employee off the clock"). Plaintiffs in those cases argued that they worked hours in addition to those recorded, but offered nothing more than vague or unreasonable overtime hours that stood in contrast to the employer records. *See Harvill*, 433 F.3d at 441 (plaintiff "offered no factual allegations *at all* to substantiate her claim, and she presented *no* evidence of the amount or extent of hours she worked without compensation" (emphasis in original)). Here, however, Xuan provided an estimate of her hours and explained how she calculated them. Given the dearth of records maintained by Defendants, Xuan's description of her "typical day" is comparatively precise. A factfinder could justly and reasonably infer that Xuan worked the hours she claims.

Finally, Defendants argue that even if Xuan's testimony could be believed, the Court should nevertheless find that Xuan's statements have been negated by Defendants' evidence.

(Def. Opp'n 10.) In particular, Defendants allege that Hwang reviewed the daily work schedules during the time period of Xuan's employment and created a chart showing that she only worked approximately 2–7 hours each day. (JYC Suppl. Interrog. Resp., ECF No. 133-6.) However, as Xuan correctly points out, JYC failed to show that the chart is admissible. (Xuan Reply 6-8, ECF No. 141.) The chart, which does not purport to summarize the daily work schedules but rather to extract information from them, does not comport with Rule 1006 of the Federal Rules of Evidence, and is akin to an inadmissible testimonial aid. *United States v. Wood*, 943 F.2d 1048, 1053 (9th Cir. 1991); *see* Fed. R. Evid. 1006. There is also a foundation problem: not a single underlying work schedule was filed with Defendants' motion, and it is unclear whether the schedules show what Defendants allege. Without additional foundation, the Court cannot consider JYC's chart.  Accordingly, the Court must deny the Defendants' motion with respect to the hours worked.

Xuan argues that the Court should enter summary judgment in her favor because the evidence she presented justly and reasonably shows the amount of overtime she worked, and because Defendants have failed to provide any evidence of the precise amount of work she performed. However, Xuan's credibility—particularly as the only witness—is very much at issue.

Xuan's allegations have changed over the course of the case. In her verified complaint, Xuan alleged that she worked "in excess of 18 hours per day, seven days per week" with the exception of the one month she took a vacation. (Compl. ¶ 44, ECF No. 3.) But based on her deposition testimony—in which she disclaimed working 18 hours each day—the statement in her verified complaint cannot be true. Because Xuan has put her credibility in question, the matter should go to trial before a factfinder. *See Hoover v. Switlik Parachute Co.*, 663 F.2d at 968. The Court will therefore deny Xuan's motion with respect to the hours worked issue.

*c.  Willful FLSA Violation; Good Faith Error*

The parties next raise two related issues: Defendants seek a judgment that their FLSA violation was not "willful," and that therefore the statute of limitations is two years instead of three; Xuan seeks a finding that Defendants did not act in good faith, and that therefore she is entitled to liquidated damages should she prevail on the merits. Because the Court finds that Defendants' violation was willful, Xuan is entitled to summary judgment on both issues.

An employer's willful violation of the FLSA extends the statute of limitations on filing a claim from two to three years. 29 U.S.C. § 255(a) (stating that claims for unpaid wages and overtime compensation must be filed within two years of accruing, "except that a cause of action arising out of a willful violation may be commenced within three years"). An employer violates the FLSA willfully if he either "knew or showed reckless disregard for the matter of whether [his] conduct was prohibited by the statute." *McLaughlin v. Richland Shoe Co.*, 486 U.S. 128, 133 (1988); *see Trans World Airlines, Inc. v. Thurston*, 469 U.S. 111, 126-27 (1985). In *Thurston*, the Supreme Court found no willful violation when defendants "acted reasonably and in good faith in attempting to determine" whether their collective bargaining agreement would violate recently amended law. 469 U.S. at 129 (noting that defendants consulted their attorneys and formulated a new policy in an attempt to comply with the new law); *cf.* 29 C.F.R. § 578.3(c)(3) ("an employer's conduct shall be deemed to be in reckless disregard of the requirements of the Act, among other situations, if the employer should have inquired further into whether its conduct was in compliance with the Act, and failed to make further inquiry").

Here, Hwang admitted that he knew of his obligations under the law to pay minimum wages and overtime compensation. (JYC Depo. 66:19-67:20.) Indeed, before the events of this case transpired, another employee had already complained officially about not being paid wages.

10

1   (Hwang Depo. 17:20-23.) Hwang stated that he believed he was paying Xuan more than what the

2   law required, but nevertheless failed to track hers or any other employee's hours. In other words,

3   Hwang, understanding the requirements of the FLSA and the risk of noncompliance, determined

4   to proceed as if the risk did not exist at all—the very definition of willful. *See Haro v. City of Los*

5   *Angeles*, 745 F.3d 1249, 1258 (9th Cir. 2014) ("An employer who knows of a risk that its conduct

6   is contrary to law, yet disregards that risk, acts willfully."). Unlike the defendants in *Thurston*,

7   Hwang took no steps to confirm his sense that he was paying his employees a lawful wage, despite

8   his knowledge that he might not be.

9       Even viewing the evidence in the light most favorable to Defendants, and crediting that

10  Hwang truly believed that he was paying Xuan lawful wages, he nevertheless recklessly

11  disregarded the possibility that JYC was not in compliance with the FLSA. *See Alvarez v. IBP,*

12  *Inc.*, 339 F.3d 894, 909 (9th Cir. 2003) (finding a willful violation where defendant "was on notice

13  of its FLSA requirements, yet took no affirmative action to assure compliance with them").

14

15      Accordingly, even though Defendants sought summary judgment on the willfulness issue,

16  because the facts can only support a finding of willfulness, even viewed in the light most favorable

17  to Defendants, there is no triable issue of fact and the Court finds that the three-year statute of

18  limitations applies. *See* 29 U.S.C. § 255(a).

19

20      Xuan raises a related issue: whether Defendants will be liable for liquidated damages if

21  she proves at trial that she worked hours for which she was not compensated. Because

22  Defendants' violation of the FLSA was willful, she will be entitled to liquidated damages if she

23  proves her unpaid worked hours. 29 U.S.C. § 260 (a court has discretion to award no liquidated

24  damages if the employer's failure to comply with the FLSA "was in good faith and that he had

25  reasonable grounds for believing that his act or omission was not a violation of the [FLSA]"); *see*

*Chao v. A-One Med. Servs., Inc.*, 346 F.3d 908, 920 (9th Cir. 2003) ("a finding of good faith is plainly inconsistent with a finding of willfulness"); *Bothell v. Phase Metrics, Inc.*, 299 F.3d 1120, 1130 (9th Cir. 2002) (noting that evidence of good faith makes it impossible to find willfulness). Here, the facts viewed in the light most favorable to Defendants show that their failure to comply with the FLSA was not made in good faith.

### d. Defendants' Employer Status

The final issue is whether each Defendant was an "employer" for purposes of the FLSA. Xuan argues that JYC, SYC, Hwang, and Park were all her employers. Defendants argue that Park was not an employer. The Court finds that, under the FLSA's broad definition, JYC, SYC, and Hwang were Xuan's employers. Park was not, and judgment will be entered in her favor.

The FLSA broadly defines an employer as "any person acting directly or indirectly in the interest of an employer in relation to an employee." 29 U.S.C. § 203(d); *see Hale v. Arizona*, 993 F.2d 1387, 1393-94 (9th Cir. 1993) (noting that courts consider the economic reality and the totality of the circumstances in an employment relationship). Among the factors considered are whether an employer "(1) had the power to hire and fire the employees, (2) supervised and controlled employee work schedules or conditions of employment, (3) determined the rate and method of payment, and (4) maintained employment records." *Bonnette v. California Health & Welfare Agency*, 704 F.2d 1465, 1470 (9th Cir. 1983) (noting that the factors are "not etched in stone and will not be blindly applied").

Here, Xuan worked for JYC as a tour driver, for SYC at the restaurant, and reported directly to Hwang as her supervisor. The common factor in all entities was Hwang, who made all business and corporate decisions, including whom to hire or fire, when and where they would work, and the terms of their employment. *See Bonnette*, 704 F.2d at 1470. Viewing the facts in

12

the light most favorable to JYC, SYC, and Hwang, the Court can only conclude that they were "acting directly or indirectly in the interest of an employer in relation to an employee," and that they are therefore employers under the FLSA. 29 U.S.C. § 203(d). Indeed, Defendants do not contest that JYC, SYC, and Hwang were Xuan's employers in their opposition brief.

However, Defendants stridently—but correctly—point out the absence of evidence tending to show that Park was Xuan's employer. (Def. Mot. 4-9.) Xuan's responses in opposition do little more than reveal the absence of any triable issue. (Xuan Opp'n 7-9, ECF No. 137.)

First, Xuan asserts that corporate funds were comingled with Hwang and Park's personal funds in their checking account. (JYC Depo. 101:7-103:14.) True, but there is absolutely no evidence that Park, who is Hwang's wife, had anything to do with the comingling. Hwang testified that he passed JYC money through his personal bank account to pay for hotel visits for JYC tourists. (JYC Dep. 102:5-20.) Xuan cannot point to any similar conduct by Park.

Second, Xuan states that "Hwang and Park [were] in positions of control" and cites generally to her Proposed Findings of Uncontroverted Fact. (Xuan Opp'n 8.) Xuan's citation does not comport with Rule 56(c), which requires citations to "particular parts of materials in the record," and will therefore not be considered. Fed. R. Civ. P. 56(c)(1)(A).

Third, Xuan asserts that Park (and Hwang) attempted to shield themselves from personal liability by filing separate answers to Xuan's complaint. It is unclear how that fact could establish that Park was Xuan's employer. Indeed, it is exactly what a defendant who had nothing to do with the case might do.

Fourth, Xuan posits that Hwang and Park used the business entity for their own financial benefit by comingling funds and putting "corporate assets in individual name." (Xuan Opp'n 8.) The Court has already dealt with the comingling issue above. To the extent that corporate assets

13

were recorded under an individual's name, the record shows that the name was Hwang, not Park. (Hwang Depo. 104:9-12.)

Fifth, and most puzzling, Xuan again complains that Hwang and Park comingled corporate and personal funds in their bank account. The statement is no more persuasive the third time than it was the first.

The FLSA definition of employer may be broad, but it cannot be so broad as to foist liability on every employer's spouse, as Xuan would apparently have the Court do. Because Defendants have demonstrated the absence of a genuine dispute as to Park's employer status, the Court will grant summary judgment in favor of Park.

## IV.   CONCLUSION

The fundamental issue of this case is whether Xuan worked hours for which she did not receive compensation. The resolution of that issue, fraught as it is with credibility determinations, cannot be accomplished without a trial. Accordingly, it is ORDERED that the cross-motions for summary judgment regarding the issue of hours worked are denied.

For the reasons stated above, the Court makes the following determinations of law:

1. JYC, SYC, and Hwang were Xuan's employers for purposes of the FLSA;

2. Park was not Xuan's employer for purposes of the FLSA;

3. The FLSA statute of limitations is three years; and

4. Liquidated damages will be necessary if Xuan prevails on the merits.

Accordingly, it is hereby ORDERED that Defendant Park is dismissed from this lawsuit.

SO ORDERED this 9th day of December, 2015.

RAMONA V. MANGLONA
Chief Judge

14